## Case No. 4,361.

### The ELIZABETH FRITH.

[Blatchf. & H. 195.] [1]

District Court, S. D. New York. Jan. 25, 1831.[2]

[1] [Reported by Samuel Blatchford, Esq., and Francis Howland. Esq.]

[2] [Modified and affirmed in Case No. 4,353.]

Edwin Burr and Erastus C. Benedict, for libellants.

Gerardus Clark and Henry M. Western, for claimants.

BETTS, District Judge. This case comes up on exceptions to the answer. The points raised by the exceptions are: 1. Whether an averment in the answer that proceedings were taken by the seamen before a justice of the peace, preparatory to the formal commencement of this action, prior to the expiration of ten days after the arrival of the vessel, is irrelevant. I do not propose now to enter into a discussion as to the pertinency of this averment, as the point is substantially before me for adjudication in another cause. As that case may be decided upon other grounds, I am disposed to leave the present one in such situation that the subject may be properly brought before the court, and directly determined, either in this or in an appellate court. The counsel for the libellants is in error in supposing that this point was decided on exceptions in another case. I have looked into the papers in the case referred to, and find that the matter there ruled to be irrelevant was an averment that in the proceedings before a justice of the peace an offer was made by the owner to pay the wages claimed, and a statement of the reasons why that offer was not fulfilled. The distinct point was not raised, that the justice had proceeded in the case without jurisdiction. Had the present exception been taken for insufficiency, I

should have sustained it, as the answer does not set forth enough to negative the jurisdiction of the justice in the matter, even though the proceedings before him may have been taken within ten days after the arrival of the vessel. Disposing of the point upon the exception as taken, I shall not rule this averment out of the answer for irrelevancy, although it is imperfectly pleaded.

2. The other exception must prevail. The libel charges that the seamen were put upon short allowance, and that the quantity of provisions required by statute had not been shipped previous to the sailing of the vessel. The answer neither admits nor denies the allegation as to short allowance. It asserts that the crew were supplied with "such a reasonable and proper quantity of good and wholesome provisions for their support, as was consistent with a prudent regard to the probable length of the voyage, and the safety of their lives and those of one hundred and forty passengers on board, and that there is no just cause of complaint as to the allowance of bread and other provisions." This averment is too loose and indistinct to supply the evidence for which the libellants called, nor does it comport with the principles of good pleading, independent of its inadequacy as a discovery and as proof to be used on the hearing, for it does not set forth the facts which it claims to amount to a compliance with the statute, and avers that the acts of the master were a sufficient justification, without stating what those acts were, and without submitting them to the judgment of this court. This would be palpably bad as a plea, and, when an answer is used as a bar to an action, it should contain the substantial ingredients of a plea in bar.

The other branch of this exception is equally well taken. The claimants must answer precisely whether they had shipped the quantity and quality of provisions required by the statute. Their answer is coupled with a qualification which renders it indefinite and uncertain.

The first exception is disallowed, and the second is allowed, with costs.

The answer of the claimants, upon the merits, did not deny the balance of wages claimed by the libellants to be due, but set up various matters of defence constituting a forfeiture of wages by portions of the crew, namely, that the cook, one of the libellants had been turned out of his post for ignorance and intemperance; that Rickers, another of the libellants, pretended to be sick during the voyage, for the purpose of escaping work, and did avoid work under that pretence; and that all the other libellants, except Anderson, but especially Foy and Davis, had been guilty of various acts of insubordination, amounting to mutiny. It also averred that all the libellants had incurred a forfeiture of their wages, by de-

serting the vessel before her cargo was unladen, and denied the fact of short allowance, and that there was any contract to furnish the crew with small stores. The facts, as proved, are sufficiently set forth in the opinion of the court.

BETTS, District Judge. The answer in this case is drawn very inartificially and indistinctly, and is so wanting in precision that it would not, in any event, be entitled to operate as evidence for the claimants, if, under the rules of admiralty pleading, it could become so. It amounts to no more than a plea putting in issue the demands of the libellants. Exceptions were originally taken to it, and were most of them sustained by the court, but it seems that, to avoid the delay of perfecting the answer, the proctors for the libellants have waived the decree upon the exceptions, and both parties have consented to go to hearing upon the answer as it stands. "Valeat quantum valere debet."

The defence set up with regard to the whole crew, namely, that they have incurred a forfeiture of their wages by desertion, will be first considered. The libellants allege that the vessel arrived at this port, and was safely moored, on the 1st day of June last, and that they were all discharged on the third day thereafter. The answer admits the arrival, but denies that the vessel was moored until the 3d day of June, and also denies that the libellants were discharged on the 3d day of June, or before, or since, and avers that they wilfully deserted before the cargo was unladen, and before ten days had elapsed after the vessel was moored, and that, by force of the laws of the United States, and of the shipping articles, and of certain entries in the log, their wages had become forfeited.

The course of decision obtaining in this court upon the subject of desertion has been, that the desertion by a seaman in the merchant service which produces a forfeiture of wages as the necessary and inevitable consequence, being an offence specifically defined by statute,—Act July 20, 1790, § 5 (1 Stat. 133), —and the mode of proof being also prescribed by statute, the party setting up such offence is bound to make it out in conformity to the act of congress; and that, accordingly, neither by the usages of maritime law nor in consequence of stipulations by seamen in their shipping articles, can a desertion in the sense of the statute exist, so as to carry an absolute forfeiture of wages, unless the act is brought within the terms of the statute and is proved as therein directed. The Martha [Case No. 9,144]; The Cadmus, supra. So, with respect to the various engagements of seamen in their contracts, that if they do or refuse to do certain acts, they shall forfeit their wages, this court has always held such stipulations to be in the nature of penalties, and therefore subject to the discretion of the court as to the degree and extent to which they will be enforced. This doctrine has

been frequently applied to the case of seamen leaving their vessel, or refusing to unload her in her port of discharge, after the nautical voyage is terminated. If the service terminates at that port, I have held that the provisions of the act do not apply, as desertion can occur only during the continuance of a voyage, and the voyage is ended, within the intendment of the maritime law, when the vessel is safely moored in the port of discharge and is ready for unlading, although the seaman may be bound by his contract to unload the cargo, or perform other labor, or remain on board for a fixed period of time afterwards. The Martha, supra; The Cadmus, supra. See, also, The Baltic Merchant, Edw. Adm. 86; Brown v. Jones [Case No. 2,017]. The refusal of the mariner to fulfil such an engagement might be punished by withholding the full amount of his wages; yet this penalty rests in the discretion of the court, and is not that absolute forfeiture of wages which is prescribed by the statute, and which, when incurred, must be pronounced without regard to the demerits of the seaman or to the injury suffered by the owner. Act July 20, 1790, § 5 (1 Stat. 133).

So, also, it has been decided by this court, that if a vessel makes this her port of discharge, and the seamen go on shore without leave, but return within forty-eight hours, and are within the control of the master, although they refuse to assist in unloading the vessel or in doing duty, such unauthorized absence or violation of duty, though a misfeasance, and subject to punishment by abstraction of wages, is not the desertion which necessarily works a forfeiture of wages. The Cadmus, supra. On appeal to the circuit court, this point was ruled otherwise, and it was held that an absence without leave, or a refusal to remain on board or to do duty, was a desertion according to the principles of maritime law, and carried with it an absolute forfeiture of wages, and need not be proved in the mode pointed out by the statute. If that decision is to be understood, as was urged on the part of the claimants on the argument, as laying down the doctrine that every absence of a seaman, which, in the maritime sense, may be termed desertion, and be punished as such, has now necessarily the statutory punishment affixed to it, the operation of the rule upon seamen who may have done their duty faithfully during an absence of years, however severe and out of just proportion to the offence, cannot now be regarded by this court. The rule declared by the court to whose decisions it is both the wish and the duty of this court to submit, will be conformed to implicitly, and will be in no way disregarded in this case, because, in my opinion, this case stands upon ground not touched by the judgment of the circuit court in the case of The Cadmus. The distinction between that case and the present one is, that in the former the term for which the seamen had shipped did not expire at this port.

They were bound to continue with the vessel either until her return to one of the eastern states, or for a fixed period extending several months beyond the time of her arrival here. This port was accordingly one of transit in the voyage, and the seamen were under the same obligations to the ship here as in a foreign port. Desertion during the course of the voyage may carry with it, according to the doctrines of the law maritime, a forfeiture of wages, which may be exacted to the utmost extent, although it is understood that it is not imperative upon the court to pronounce that judgment alone. The error of this court in The Cadmus, which was corrected by the decision of the circuit court, seems to have been in construing the act of congress as superseding, in this particular, the law maritime, and as supplying the entire rule by which a statutory desertion, authorizing a forfeiture of wages, could be established, and in holding that, to constitute such desertion, there must be a continued and actual absence from the vessel, and that, if the sailor was on board, or within the control of the officers, his refusal to do duty could not be treated as a desertion which carried a forfeiture of wages as the specific punishment to be inflicted. But, supposing the rule to be carried further by the circuit court, and to be now settled by the decision referred to, that any unjustifiable absence of a seaman from his vessel in a home port, before the voyage is ended, amounts to a desertion, which, without regard to the statutory proofs, must be visited with a forfeiture of wages under the law maritime, it would yet remain an open question, not covered by that decision, whether a mariner, leaving his vessel after the voyage was ended, would be deemed guilty of desertion.

Moreover, if that decision embraces the latter position, and an unauthorized absence of the sailor from his ship in her home port after the voyage is terminated, but before he is entitled to demand his discharge under his contract, is a desertion which forfeits his wages, yet, in my judgment, sufficient proof has been offered by the libellants that their absence in this case was not unauthorized by the master. The vessel had no cargo. She brought passengers only. She arrived in this port on the 1st of June, and was made fast to the wharf on the 3d. The mate permitted the crew to go ashore and procure dinner, with orders to them to return. Most of them returned that afternoon, and worked until six o'clock in clearing decks. On the following Friday, they took their effects, in the presence of the master, had them all examined, and left the vessel with his knowledge. He told the men he would pay their wages the next week, and neither he nor the mate made any objection to their going on shore, nor gave any command or request that they should return. There was nothing more to be done on board. The ballast was not to be discharged, and the passengers had all, ex-

cept one, left the ship. It appears to me that the absence of the libellants, under such circumstances, cannot, with any propriety, be declared a wilful desertion. They could not have maintained a right to continue with the vessel, and to render her liable for wages, after the voyage had ended, and after all occasion for their services was determined. The attempt to turn their act into a criminal offence, subjecting them to the loss of all their wages, rests upon mere technicalities, and is destitute of all color of equity. Indeed, it appears to me that this claim of a forfeiture of wages is an afterthought, got up since the seamen undertook to collect them by process of law. I shall overrule this branch of the defence.

The payment of wages is also resisted on the ground of larceny, and disorderly and mutinous conduct by the crew on the homeward voyage. The answer upon this point is exceedingly ambiguous and indefinite, and, as to all the crew except Rickers, Foy and Davis, is clearly so defective in substance as to debar the claimants from offering any evidence under it. Indeed, there would be good ground for excluding all testimony in relation to the misconduct of any of them except Davis, because of the loose and indistinct manner in which the claimants have alleged these matters in their answer. The observations of Judge Story upon this subject, in Orne v. Townsend [Case No. 10,583], are replete with sound legal criticisms, and I should have felt well sustained by authority if I had refused to hear the proofs read. But, as this course would probably only have led to procrastination, and to a petition for leave to amend, and as the libellants appeared to have apprehended what the claimants meant to charge against them, and had produced all the evidence they wished to offer upon that subject, I conceive it to be better to allow the proofs to be read, and, if practicable under the pleadings, to settle the whole controversy between the parties in conformity to the facts presented by them.

The charges specified against Rickers, Davis and Foy are, that Rickers feigned indisposition, and thus avoided doing his duty during the whole passage from London to this port, and encouraged a spirit of mutiny in the crew; that Davis disobeyed the master's orders, and struck or kicked him; and that Foy used insolent and mutinous language to the master. The weight of evidence is decidedly against the imputations made by the answer on Rickers. His indisposition was real, and he is proved to have been unable to perform his duties on board the vessel. There is no shadow of evidence in support of the loose suggestions that he gave countenance to a mutinous disposition in the crew; nor do I perceive any evidence that such disposition existed among the crew, other than that the men freely expressed their dissatisfaction at being put on short allowance. This was not accompanied by any threats or disre-

spectful language, or by any act of insubordination on the part of the crew generally.

The master received a blow from Davis, and, though one witness states it was given deliberately by Davis, whilst lying in his berth, yet the clear preponderance of proof is, that it was given by a kick whilst the master, the mate and a passenger were hauling him by force up the forecastle in the dark; and the circumstances render it as probable that it was given at random in the struggle in which the parties were engaged, as that it was designed against the master. The evidence with regard both to Davis' acts and to the conduct of the master, is exceedingly contradictory. The master does not seem to have considered the blow at the time in the light he would now have the court view it. After being overpowered, Davis went submissively to his duty, and no further notice was ever taken of the occurrence, until it was set up in this action in bar of wages. The master appears to have thought that Davis had received an adequate correction at the time; for, after it was over, he admonished him, that though it was in his power to confine him in irons for what had been done, yet he should not do it. Davis, before and after that, conducted himself unexceptionably. His actual offence was, that he disobeyed the positive orders of the master to come on deck. This was a plain violation of his duty, and the court cannot permit it to pass without animadversion. Seamen can never be permitted to debate the reasonableness and propriety of the orders given by their officers. Their duty is, to obey implicitly every lawful command. The court will see them properly recompensed for any unnecessary oppression or severity in the conduct of their officers; but it will not tolerate any hesitation in a prompt and active obedience to orders on board. Davis, having performed his watch and retired, was called into another watch before his regular turn. The master alleges that this was done for the purpose of a new organization of the watch. The court does not go into an examination of the testimony offered to prove that the order was unnecessary, or oppressive upon Davis. The master could, at his discretion, re-organize the police and service of the ship, and the seamen were bound to obey his orders without resistance or murmuring. The court cannot uphold the notion with sailors, that they can refuse to obey an order of the master because they suppose he requires a duty not necessary at the time, and will, accordingly, in this case, mark the impropriety of Davis' conduct by an abatement of his wages. In regarding all the circumstances of the case, I should have been better satisfied if, the discipline of the vessel having been established, and the sailor having fully submitted, the master had adhered to what was evidently his first intention, and had considered the difficulty terminated at the time by the slight punishment of Davis

for disobeying the orders of his officers. But as the master did not distinctly pardon the offence, I shall, upon the ground that an offence has been committed by Davis, which is not justified or condoned, direct a deduction from his wages of his pay for one-half of a month.

Foy, in his remonstrance with the master against the short allowance, conducted himself improperly and insolently. He had a right to make known the wants of himself and of the crew, but it should have been done in a manner and in language more respectful. His deportment tended to promote insubordination and disorder; and, as a punishment for this misconduct, I shall direct his wages for one month to be deducted from his pay. I adopt this mild punishment because I am satisfied the altercation was unpremeditated, and because the chastisement shortly after inflicted on him, and which, the mate says, was for this same impertinence, and which he submitted to unresistingly, seemed then to be regarded on all sides as ending the affair, so far as the vindication of the master's authority was concerned. Foy performed his duty unexceptionably from that time, and no recollection of any misconduct seems to have been cherished by the master. He consented that all the men should leave the vessel, and promised that all, without exception, should be paid the next week. The offence had, in effect, been forgiven, and it is now too late for the master to recall such an instance of irregular and insubordinate conduct in the course of the voyage, in order to make it the foundation of a forfeiture of wages. Under these circumstances, I do not think justice demands, in any of these cases, more than that degree of punishment which shall serve to admonish the seamen that the court will not, except in cases of most imminent and irresistible necessity, countenance any act of insubordination from the crew towards their officers, at sea and in the discharge of their duties.

The imputations thrown out by the answer, that the crew had embezzled property belonging to the passengers, and that a spirit of mutiny was fomented amongst them, are unsupported by proof.

I shall accordingly decree in favor of all the libellants for the wages in arrear; and, indeed, except as to Rickers and Foy, I do not perceive any ground for a denial of full wages to the crew.

The cook was properly degraded, and can only recover wages for the duties he performed, namely, those of an ordinary seaman. His competency and conduct in the station of cook were matters for the master to decide upon, in the first instance; and, where he has decided without partiality and upon the evidence before him, I should look for a very strong case, to justify a disregard of his determination. There seems to have been strong proof before the master that the cook was intemperate, and ignorant of his business; and, whether the charge was established by the kind of evidence given or not, the master was justified, under the exigencies of the case, in degrading him from his place, on reasonable grounds for belief that he was intoxicated when employed in cooking, or was an incompetent or unsafe man to entrust with that situation.

With regard to the claim for extra wages, on the ground of a short allowance of provisions, the testimony of the libellants is explicit, that the crew were kept on a short allowance of bread during most of the passage from London here. Rickers and Anderson have no interest in this question, and, whatever distrust might be felt as to the evidence given by the other witnesses, there is no legal reason for not giving full credit to those two. There was great remissness on the part of the master. He contented himself with ordering the men to have one pound of bread each daily, and the mate, after seeing it weighed once, left the matter to the steward, who furnished the quantity by guess, and in a manner, as proved by Rickers, which must necessarily have given a deficient quantity. As the master knew, at an early day, that the men complained of the want of bread, he was bound to see personally that the proper supply was furnished them. The court will not determine what that quantity should be by weight. The navy ration of bread is fourteen ounces, together with a fair supply of other stores. Without such stores, that quantity of bread might be inadequate. Whether the pound ordered to be furnished consisted of twelve or sixteen ounces is not shown; but if of either, and insufficient for the comfortable provision of the crew, the master should have seen that it was increased, or other proper provisions furnished in its place.

Judge Peters has construed the act of July 20, 1790 (1 Stat. 131), which gives a day's extra wages to a seaman for each day he is kept on short allowance, as authorizing the increase of wages only in case the required quantity of provisions is not on board the vessel. He held, that if the vessel had the complement of stores, it rested in the discretion of the master how they should be distributed, and that, in such a case, the remedy for being put on short allowance must be by an action for damages. Mariners v. The Washington [Case No. 9,086]. It does not now become necessary to consider whether the act may not justly bear a more enlarged interpretation, because the fact that the crew were on short allowance being proved, it is necessary for the master, in order to bring himself within the privilege of the construction referred to, to prove that his vessel had on board the legal quantity of provision. This has not been done in the present case. I shall consider the short allowance as commencing on the 20th April, and continuing through the voyage. The exact period is not fixed by the testimony, the witnesses differ-

ing among themselves upon this point. I adopt the evidence of Graves, as referring to a fact which he would be very apt to recollect. He says the short allowance began four or five days after he was removed as cook. He thinks he was removed on the 10th of April, but other evidence shows it was on the 15th. The uncertainty as to the commencement must operate to the disadvantage of the libellants, and they can only have an allowance for the shortest of the various periods named.

There is no foundation in the proofs for the claim on the part of some of the libellants, in regard to small stores. No contract to furnish them is shown; and, if such a contract existed, it is exceedingly doubtful whether recompense for a breach of it could be had in this way. This branch of the claim is disallowed.

. Decree accordingly.

The cause afterwards came up again on a motion of the proctor for the libellants, that interest be allowed on all the sums decreed to the libellants from the time payment was demanded, and that a counsel fee be included in the costs. The motion for interest was resisted on the ground that the amount due the libellants was not a liquidated sum, until fixed by a decree of the court, and because the libellants connected with their claim for wages one for compensation for short allowance, which must of court be litigated, and which was only in part sanctioned by the court.

BETTS, District Judge. Interest is usually allowed upon seamen's wages from the time a demand of them is made. Here was a fixed period for payment, which had elapsed before suit was brought, and also an actual demand. Without such positive demand, the commencement of the suit would have been an adequate demand, in construction of law, to entitle the party to interest. Gammell v. Skinner [Case No. 5,210].

There is great fitness in such allowances to seamen, as the master, being their accountkeeper, always knows precisely the sum due them, and ought to tender them payment when their right to demand it has become perfect. In ordinary dealings, the creditor holds the evidence of his demand in his own hands, and, if he delays presenting it to the debtor, equity might infer that he was willing the matter should continue upon the footing already existing, and there would be a fair ground for denying him the right to charge interest. No such reason can apply to the case of seamen's wages, and the court will be inclined, as a general rule, when the seamen are so situated that the master can

offer them payment, to allow interest from the time the wages were due, until a tender or payment under the decree of the court. This principle does not apply to wages decreed because of short allowance. That is in the nature of a penalty; or, put in its most favorable light, is an unliquidated claim, and one usually to be adjusted on contestation, when probably the court may, in proper cases, make an augmentation of damages equivalent to interest. The compensation is, by statute, made a matter of right to the seaman; but the right to any allowance, and the amount due, must generally be subject to the adjudication of the court. Interest is denied, in this case, upon that part of the decree.

I am inclined to allow a small counsel fee to the libellants. I should not do it in the case of Foy, Davis and the cook, if they prosecuted alone, as there is shown to have been fair probable cause for resisting their demands in toto. But, with respect to the other libellants, their monthly wages were due, and there is nothing shown, on the part of the master, throwing a reasonable doubt upon their right of recovery. The litigation they have been driven to, has necessarily been protracted and expensive. This should have been avoided as to them, by an offer of their wages. I shall, therefore, order that there be taxed in favor of the libellants $25, as a counsel fee in this case. The sum is stated so low, to avoid charging the vessel to an unreasonable extent. The taxed costs must be heavy, and I contemplate, in this allowance, nothing more than what may about cover the disbursements of the libellants in conducting their cause. It is not designed to mark the compensation their counsel ought to receive in this case, or to operate as a precedent in other cases. As a general rule, I have refused to allow counsel fees in suits for wages, and shall probably adhere to that course of practice where the case seems to present no special reasons for departing from it. The unsuccessful litigant ought not always to be subjected, of course, to more than the current charges of the suit. The court does not intend to render the apprehension of expense so urgent, as to deter owners and masters from resisting claims for wages, which there is reasonable ground for believing cannot be supported.